## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDWARD A. BATES                              *
1727 Ruthsburg Road                          *
Queen Anne, Maryland 21657                   *
                                             *
Plaintiff,                                   *
                                             *
v.                                           *
                                             *
MOUNTAIRE FARMS, INC.                        *
29292 John J. Williams Highway               *    Civil Action
Millsboro, DE  19966                         *    No.
                                             *
SERVE ON:                                    *
                                             *
    RESIDENT AGENT:               *
    The Corporation Trust, Incorporated  *
    2405 York Road                *
    Suite 201                     *
    Lutherville-Timonium, MD 21093   *
                                             *
Defendant.                                   *

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Edward A. Bates ("Plaintiff" or "Bates"), by and through his attorneys, Craig F. Ballew, Esquire, and Ferguson, Schetelich & Ballew, P.A., and sues the Defendant, Mountaire Farms, Inc., and for reasons says:

## FACTUAL BACKGROUND

1.     At all times relevant hereto, Plaintiff Bates was and continues to be a resident of the State of Maryland.

2.      Defendant Mountaire Farms Inc. is a corporation formed in the State of Delaware, with its principal place of business located in Arkansas.

3.      Under 28 U.S.C.A. § 1441(a): "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

4.      Pursuant to 28 U.S.C.A. § 1332: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between-- (1) citizens of different States[.]"

5.      Plaintiff has named one defendant, namely: Mountaire Farms Inc., a corporation formed in the State of Delaware, with its principal place of business located in Arkansas.

<u>COUNT I</u>
(Breach of Contract)

6.      The Plaintiff incorporates Paragraphs 1 through 5 herein and expressly incorporates all facts and allegations contained therein. Mountaire is in the poultry business and coordinates a "Growing Program" with third-party contractor growers throughout the Mid-Atlantic Region.  At all times relevant to this Complaint, Mountaire was a party to multiple Broiler Production Agreements with various third-party contractor growers throughout the Maryland Eastern Shore.

7.      On or about February 11, 2016, Plaintiff Bates began communications with Brian Smith, a Broiler Service Manager for Mountaire.   At all times during their

communications and dealings, Brian Smith acted with the express authority and was the agent of Mountaire.

8.      On or about February 15, 2016, Plaintiff Bates met with Smith to further discuss and finalize the terms under which he would become a third-party contractor grower for Mountaire.  Plaintiff had rented and was prepared to utilize two chicken houses located at 1727 Ruthsburg Road, Queen Anne, Maryland 21657 and begin operations as the Fox Eagle Farm.  Mr. Smith met with Plaintiff Bates at the Fox Eagle Farm and reviewed the procedures and terms under which Plaintiff Bates would work with Mountaire as a third-party contract grower.  Mr. Smith provided information including emergency contact lists and other information related to Mountaire's Broiler Growing Program, including Broiler Growing Program Procedure Guides, Grower Payment Schedules, and the Broiler Production Agreement.

9.      At the time Brian Smith met with Plaintiff Bates, he brought two copies of the Mountaire Broiler Production Agreement.  Mr. Smith requested that Plaintiff sign one copy of the Agreement.  Plaintiff Bates signed one copy of the Broiler Production Agreement and returned that copy to Mr. Smith.  Mr. Smith then provided Plaintiff Bates with a second copy for his records.  A copy of that Agreement is attached hereto as Exhibit A.

10.      On or about April 26, 2016, Mountaire placed the first flock of broilers with Plaintiff Bates.  Consistent with the terms of the Broiler Production Agreement, Plaintiff accepted delivery and placement of the flock and provided such buildings, equipment, and labor necessary to properly care for the flock.  To meet his obligations, Plaintiff Bates took

out a loan from BB&T Bank in the amount of Ten Thousand Dollars ($10,000.00).  He also later engaged and paid employees to assist him in the care of the Mountaire flocks.

11.     In furtherance of his efforts to comply with the terms of the Broiler Production Agreement, Plaintiff Bates entered into a Nutrient Management Plan with the University of Maryland Extension.  This Plan, effective April 27, 2016, set forth a manure management plan for the two poultry houses based on Fox Eagle Farm annually caring for Four and One-Half (4.5) Flocks, or One Hundred Eighty Thousand (180,000) birds per year.

12.     On or about June 25, 2016, Mountaire moved this first flock and thereafter paid Plaintiff Bates for his services.

13.     Between April 26, 2016 and June 25, 2016, Mountaire employee Paul Akers visited Fox Eagle Farm and completed documentation referred to by Mountaire as a "Chick Placement Report."  This Chick Placement Report reviewed a series of standards related to the maintenance of the chicken houses and the care and maintenance of the flock. Among other things, the Chick Placement Report rated the care provided by Plaintiff either "ok" or "not ok" on a series of factors including:  1) drinker line height; 2) nipples triggered/flow adequate; 3) stand pipes cleaned; 4) stand pipe bowl height; 5) light intensity; 6) air quality/ammonia; 7) ventilation system working properly; 8) litter conditions; 9) curtain falls properly; 10) winterization adequate.  On the Chick Placement Report, Mountaire employee Paul Akers also included recommendations and comments. See Exhibit B, attached hereto.

14.    During this same period, Mountaire employee Paul Akers also completed certain Mountaire documents titled "Farm Visitation Report." The Farm Visitation Reports contained a longer list of twenty-two (22) categories wherein Mountaire assessed whether the care provided at the Fox Eagle Farm was "ok" or "not ok." See Exhibit C, attached hereto.

15.    Between April 26, 2016 and June 25, 2016, the Chick Replacement Report and Farm Visitation Reports consistently indicated that the care provided by Plaintiff Bates and his employees was rated "ok." On those rare occasions when Mr. Akers indicated that Plaintiff needed to make adjustments (i.e. alter the nipple drinker height, reduce the temperature in the house, and/or raise the feedline height) Plaintiff took timely steps to address Mountaire's recommendations. The final report, prepared by Mr. Akers on or about, June 13, 2016 rated Plaintiff's performance in all identified categories as "ok."

16.    Following Mountaire's movement of the first flock out of the Fox Eagle Farm on June 25, 2016, Plaintiff received a "Broiler Payment Computation dated June 29, 2016. Among other things, that computation provided Plaintiff with a report indicating that for the week of June 19, 2016 through June 25, 2016 Plaintiff's Fox Eagle Farm was ranked 41st among regional growers.

17.    On or about July 12, 2016, Defendant Mountaire placed a second flock with Plaintiff. This flock was under Plaintiff Bates' care between July 12, 2016 and September 12, 2016. Throughout this period, Mountaire employee Akers continued to visit the Fox Eagle Farm and complete both Chicken Placement and Farm Visitation Reports. Mr. Akers consistently rated the care provided at Fox Eagle Farm "ok" in the vast majority of

categories. When Mr. Akers identified corrections to be made and steps to be taken to improve the care in the houses, Plaintiff undertook corrective steps in a timely fashion.

18.    After Mountaire removed the second flock, Plaintiff Bates received a Broiler Payment Computation. Among other things, the Computation included a report indicating that Plaintiff had moved from a ranking of 41st to 35th among the growers working with Mountaire in the region.

19.    On or about January 2, 2017, Defendant Mountaire placed a third flock with Plaintiff Bates. This flock was comprised of two (2) different groups of broilers. Plaintiff cared for this flock from January 2, 2017 through March 3, 2017.

20.    Between January 2, 2017 and March 3, 2017, Mountaire employee Paul Akers completed Chick Placement and Farm Visitation Reports. Mr. Akers consistently rated the care provided by Plaintiff as falling into the "ok" category. Again, when Mr. Akers made suggestions to improve and address issues related to care of the chickens, Plaintiff took timely steps to make corrections.

21.    After the removal of the third flock, Plaintiff received two (2) Broiler Computation Reports dated March 8, 2017. The first of these Reports placed Plaintiff's Fox Eagle Farm 30th in the rankings among the 41 growers. The second Report placed Plaintiff's Fox Eagle Farm 24th among the growers.

22.    At no time did either Mountaire employee Paul Akers or Mountaire employee Brian Smith communicate to Plaintiff, verbally or in writing, that his care for the Mountaire broilers was deficient or that the Company was considering placing Plaintiff on the performance improvement plan program applicable to growers.

6

23.    Section J of the Broiler Production Agreement sets forth the terms under which Mountaire is permitted to terminate the Broiler Production Agreement:

**J.    TERMINATION PROVISIONS:**

*As a matter of convenience of not having to initiate a new contract for each Flock, this Agreement shall be continuous until terminated as follows:*

*Grower shall have a right to rescind this Agreement until 11:59 p.m. on the third business day after the day on which Grower signs the Agreement. Grower shall provide written notice of termination to the Mountaire's Live Production Manager or Breeder Manager.*

*Grower may cancel this Agreement without cause and either party may cancel this Agreement with cause, but in all cases, upon first giving the other party written notice of such decision to terminate: provided, however, that such written notice on the part of the Grower or Mountaire shall be given no less than ninety (90) days prior to the termination date. Any such notice of termination shall be personally delivered or sent by first class mail to the other party at the address set forth below such party's signature line. The notice may be given at the date the party enters the performance improvement plan program if that program applies to the Grower. In any event, Mountaire's termination notice shall specify the reasons and any appeal rights. The effective date of the termination shall be stated by the party giving notice.*

*Neither party shall incur any liability to the other party as a result of so electing to terminate this Agreement. Any claim that either party may have against the other party for sums loaned or indebtedness owed to the other party or for breach of this Agreement shall survive termination of this Agreement.*

*Termination during a Flock placement shall be in accordance with the other terms of this Agreement. Should such termination occur, Mountaire agrees to pay the Grower for all services performed until termination of this Agreement, and the Grower agrees to perform all obligations until termination of this Agreement. Except for cause or economic necessity, such as Grower's gross negligence, Flock abandonment or material financial breach, hereinafter defined, Mountaire will not terminate this Agreement without first providing Grower an opportunity to cure any deficiencies through a performance improvement plan or other written agreement reached by the parties.*

See, Exhibit A, at Section J.

7

24.    In February 2017, Plaintiff Bates was diagnosed with cancer and briefly hospitalized to begin undergoing chemotherapy treatments. During the time that he was in the hospital receiving treatment, Plaintiff's employees continued to care for the third flock.

25.    On or about February 17, 2017, Plaintiff Bates shared with Mountain employee Paul Akers the fact that he had received a diagnosis for cancer and was initiating chemotherapy treatment.

26.    On or about March 9, 2017, Plaintiff received a phone call from Brian Smith. During the call, Mr. Smith asked about Plaintiff's chemotherapy procedures. After Plaintiff Bates shared information about those procedures, Mr. Smith informed him that he had "bad news."   At that point, Mr. Smith communicated to Plaintiff Bates "We are dropping you."

27.    On or about March 10, 2017, Plaintiff received a voice message from Mountaire employee Paul Akers. That voice message stated:

> "Hey Andy, um sorry they're cutting you off, but if it were up to me I would not be doing this, unfortunately it's not up to me. I left your settlement in the pump house underneath your blue clipboard. Um, again it's in your pump house. Not bad you didn't do um, you didn't do that bad. Um, pardon me. If you give me a call back and I will review it with you but um there's a Seven Thousand Dollar check in there, maybe maybe more than that, Seventy-Five Hundred, I'm not sure. Hope you, um, get through with everything alright with your treatments. So, alright bud, take it easy."

28.    Prior to March 10, 2017, no representative of Mountaire communicated to Plaintiff Bates that there were any material deficiencies with his care of the flocks. Similarly, no one from Mountaire made any comments

suggesting that the Company was considering placing Plaintiff Bates on probation consistent with the terms of the Broiler Production Agreement.

29.    Defendant Mountaire's ability to terminate existed; however, any such termination had to be "with cause."  See Exhibit A at Section J.  Furthermore, Defendant Mountaire was required to give Plaintiff "written notice of such decision to terminate…"  Id.  Defendant Mountaire failed to inform Plaintiff of the reasons for the termination of his contract.  It also failed to inform Plaintiff of his appeal rights pursuant to the terms of the Broiler Production Agreement.  Id.

30.    Per the Broiler Production Agreement, Mountaire agreed that:

***Except for cause or economic necessity such as grower's gross negligence, flock abandonment, or material financial breach, hereinafter defined, Mountaire will not terminate this agreement without first providing grower an opportunity to cure any deficiencies through a performance improvement plan or other written agreement reached by the parties.***

Id.

31.    Defendant Mountaire never conveyed to Plaintiff Bates that any aspect of his care for the flocks involved "gross negligence."

32.    Defendant Mountaire never communicated to Plaintiff Bates that any of his actions were considered to equate to "flock abandonment."

33.    Defendant Mountaire never communicated to Plaintiff Bates that it considered him to be in "material financial breach" as defined by the Broiler Production Agreement.

34.    Defendant Mountaire never placed Plaintiff Bates on a performance improvement plan.

9

35.    Existing federal and state law set forth clear public policies prohibiting discrimination against an otherwise qualified individual with a disability.  Specifically, the Americans with Disabilities Act as amended states:

> **(a) General rule.  No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.**

42 U.S.C. §12112.

36.    Maryland law similarly recognizes protections for individuals with disabilities:

> **It is the policy of the State, in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers:**
>
> **(1) to assure all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and**
>
> **(2) to that end, to prohibit discrimination in employment by any person.**

State Government, §20-602 (2014) (Emphasis added.)

37.    Having created a contractual relationship with its growers predicated upon the growers being independent contractors, and not employees, Mountaire has denied

10

Plaintiff Bates' the ability to pursue administrative claims related to disability discrimination.

38.     Defendant Mountaire's employees knew that Plaintiff Bates has been diagnosed with cancer. Within days of receiving that notice Mountaire's employees informed him that he was being "dropped."

39.     The temporal proximity of these events combined with Mountaire employee Akers' apology reflect that the Defendant Mountaire's decision to terminate Plaintiff's contract was due to the fact that he had informed Mountaire's employees that had been diagnosed with and was receiving treatment for cancer. But for providing this notice, Plaintiff Bates' Broiler Production Agreement would not have been terminated.

40.     While federal and state anti-discrimination statutes do not provide independent contractors with the same protections provided to employees, it remains clear that the public policy of the United States Government and the State of Maryland prohibited terminating Mr. Bates' Broiler Production Agreement because of his disability.

41.     By the aforementioned actions and omissions, Defendant Mountaire has materially breached the Broiler Production Agreement with Plaintiff Bates.

42.     As a direct and proximate result of Defendant Mountaire's material breach of Broiler Production Agreement, Plaintiff Bates has sustained economic injuries and personal injuries, both in the past and in the future.

43.     Despite his best efforts to mitigate his damages, Plaintiff Bates has not been able to enter into an agreement with any other poultry producer that would permit him to remain in the industry and raise broilers for another company.

WHEREFORE, the Plaintiff claims compensatory damages against Mountaire Farms, Inc. in excess of Seventy-Five Thousand Dollars ($75,000.00), plus all costs and legal interest.

FERGUSON, SCHETELICH & BALLEW, P.A.

By:    _____/s/_____
Craig F. Ballew
Federal Trial Bar No.: 04932
1401 Bank of America Center
100 S. Charles Street
Baltimore, Maryland  21201-2725
Phone:  (410) 837-2200
Fax:  (410) 837-1188
cballew@fsb-law.com

## **DEMAND FOR TRIAL BY JURY**

The Plaintiff demands a trial by jury on all issues plead in his Complaint.

FERGUSON, SCHETELICH & BALLEW, P.A.

By:    _____/s/_____
Craig F. Ballew
Federal Trial Bar No.: 04932
1401 Bank of America Center
100 S. Charles Street
Baltimore, Maryland  21201-2725
Phone:  (410) 837-2200
Fax:  (410) 837-1188
cballew@fsb-law.com