IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EDWARD A. BATES, | * | |
| Plaintiff, | * | |
| vs. | * | Civil Action No. ADC-18-0969 |
| MOUNTAIRE FARMS, INC., | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## **MEMORANDUM OPINION**

Defendant, Mountaire Farms, Inc., moves this Court for summary judgment (the "Motion") (ECF No. 25). Defendant seeks a ruling from the Court that it did not breach its Broiler Production Agreement (the "Agreement") with Plaintiff, Edward A. Bates, but rather that it was entitled to terminate the Agreement and properly did so due to Plaintiff's alleged deficient performance. Plaintiff filed an opposition to Defendant's Motion (ECF No. 26) and Defendant replied (ECF No. 27).

After considering the Motion and responses thereto, the Court finds that no hearing is necessary. *See* Loc.R. 105.6 (D.Md. 2018). In addition, having reviewed the pleadings of record and all competent and admissible evidence submitted by the parties, the Court finds that there are genuine issues of material fact as to the claim asserted. Accordingly, the Court will DENY Defendant's Motion (ECF No. 25).

## **FACTUAL BACKGROUND**

Defendant Mountaire Farms, Inc. is a producer in the poultry business and runs a "Growing Program" in which it contracts with third-party growers to raise flocks of broiler chickens. ECF No. 1 at 2, ¶ 6; ECF No. 1-3 at 1; ECF No. 4 at 2, ¶ 6. Through the Growing Program, Defendant

1

engages third-party growers who own or occupy land to raise the broilers and memorializes the relationship with the growers in Broiler Production Agreements. ECF No. 25-2 at 1, ¶ 4. Pursuant to these Agreements, growers "take possession of flocks of broiler chickens owned by [Defendant] and use their own knowledge, skill, experience, and discretion to provide care to the flocks in accordance with applicable industry and animal welfare standards," and Defendant retains title and ownership of the broilers while they are in the growers' possession. *Id.* at 2, ¶ 5. Defendant's employees, including Flock Supervisors and Broiler Service Managers, periodically visit the third-party growers' farms to check on the flocks' progress. *Id.*

In February 2016, Plaintiff met with Defendant's employee and Broiler Services Manager, Brian Smith, to discuss joining the Growing Program as a third-party grower. ECF No. 1 at 3, ¶¶ 8–9; ECF No. 4 at 2, ¶¶ 8–9. On March 8, 2016, Plaintiff and Defendant entered into the Agreement in which Defendant agreed to "furnish [Plaintiff] with a flock . . . of birds to raise for broiler production" and Plaintiff agreed to furnish and provide the facilities and personnel necessary to properly care for the broilers. ECF No. 25-6 at 1–2, 10. Thereafter, Plaintiff hosted three flocks of broilers between April 2016 and March 2017. ECF No. 1 at 3–6, ¶¶ 10, 12, 17, 19. During this time, Paul Akers, Defendant's employee and Flock Supervisor, made regular visits to Plaintiff's farm to conduct inspections and monitor the care of the flocks. *Id.* at 4–6, ¶¶ 13–14, 17, 20; ECF No. 1-4; ECF Nos. 26-7, 26-9, 26-11. After each visit, Mr. Akers completed Chick Placement Reports and Farm Visitation Reports.[1] ECF Nos. 26-7, 26-9, 26-11.

---

[1] Chick Placement Reports assess a series of criteria related to the maintenance of the chicken houses and the care of the flock and rate the grower's performance in these areas as "ok" or "not ok." *See* ECF Nos. 26-7, 26-9, 26-11. Similarly, Farm Visitation Reports assess a more comprehensive set of criteria related to the care and maintenance of the flock and rate the grower's performance as "ok" or "not ok." *See id.*

2

On or about April 26, 2016, Defendant placed the first flock with Plaintiff. ECF No. 26-3 at 8–9; ECF No. 26-7 at 1; ECF No. 26-8. Chick Placement Reports and Farm Visitation Reports completed by Mr. Akers between April 26 and June 13, 2016 demonstrate that Plaintiff's care was consistently rated "ok." ECF No. 26-7. Plaintiff received "not ok" ratings on only two reports during that period, *id.* at 5, 6, and remedied those issues prior to the final report, which stated that "[e]verything . . . looks good," *id.* at 7. On June 25, 2016, Defendant moved the first flock. ECF No. 26-8.

On or about July 12, 2016, Defendant placed the second flock with Plaintiff. ECF No. 26-10 at 1. Chick Placement Reports and Farm Visitation Reports completed by Mr. Akers between July 13 and August 30, 2016 again demonstrate that Plaintiff's care was rated "ok" for the majority of the criteria. ECF No. 26-9. While the reports reflect "not ok" ratings in some criteria during that period, they show that Plaintiff remedied many of the issues promptly after each inspection and report. *See id.* However, several of the reports also demonstrate that Plaintiff consistently struggled to maintain proper migration of the broilers throughout the chicken houses and properly dispose of dead broilers. *Id.* at 4–11. Additionally, a report dated August 26, 2016 reflects that Plaintiff failed to respond to alarms indicating problems with chicken house temperature and ventilation, which then prompted Mr. Akers to call for a formal meeting. *Id.* at 10. Finally, on or about September 11, 2016, a flood occurred when a pipe burst in one of the chicken houses. ECF No. 26-4 at 8–9. Plaintiff failed to fence the flooded area off for the health and safety of the broilers, despite instructions to do so, which then required Mr. Smith and Mr. Akers to step in. *Id.* The following day, on September 12, 2016, Defendant moved the second flock. ECF No. 26-10 at 1.

On or about January 2, 2017, Defendant placed the third and final flock with Plaintiff. ECF No. 26-12 at 1. Chick Placement Reports and Farm Visitation Reports completed by Mr. Akers between January 3 and February 20, 2017 demonstrate that Plaintiff's care was consistently rated "ok." ECF No. 26-11. While Plaintiff received a few "not ok" ratings over the course of several reports during that period, *id.* at 5–8, 10, the reports generally reflect that he remedied these issues promptly, *id.* at 5–10. As compared to reports from the second flock, Plaintiff's migration improved, and several notations stated that the broilers, conditions, and equipment were in good shape. *Id.* at 1–5, 9. On March 3, 2017, Defendant moved the third flock. ECF No. 26-12 at 1.

In February 2017, during the placement of the third flock, Plaintiff was diagnosed with cancer and began undergoing chemotherapy treatments. ECF No. 26-3 at 14–15. Due to his diagnosis and treatments, Plaintiff was absent from his farm for approximately one week. *Id.* at 15. Plaintiff's employees, Stephen MacEmcy and Denise Jones, managed the broilers and the farm in his absence. ECF Nos. 26-14, 26-15. Around this time, Plaintiff informed Mr. Akers that he had been diagnosed with cancer and was undergoing chemotherapy treatment. ECF No. 26-3 at 14–15. Shortly thereafter, Mr. Smith informed Plaintiff that Defendant was terminating the Agreement. *Id.* at 16; *see* ECF No. 25-2 at 6, ¶ 23.

## PROCEDURAL BACKGROUND

On April 5, 2018, Plaintiff filed suit in this Court, alleging that Defendant breached the Agreement by failing to give Plaintiff written notice of the termination, provide Plaintiff with the reason for the termination, or place Plaintiff on a performance improvement plan prior to termination. ECF No. 1 at 9, ¶¶ 29–34. Plaintiff also alleged that Defendant terminated the

Agreement due to Plaintiff's cancer diagnosis. *Id.* at 11, ¶¶ 38–39. Defendant filed an answer on May 11, 2018. ECF No. 4.[2]

On April 15, 2019, Defendant filed its Motion, seeking summary judgment against Plaintiff on his breach of contract claim. ECF No. 25. On April 29, 2019, Plaintiff filed an opposition. ECF No. 26. Defendant filed a reply on May 13, 2019. ECF No. 27.

This matter is now fully briefed, and the Court has reviewed Defendant's Motion as well as the responses thereto. For the following reasons and pursuant to Federal Rule of Civil Procedure 56(d), Defendant's Motion (ECF No. 25) is DENIED.

## DISCUSSION

### A. Standard of Review

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Supreme Court has clarified that not every factual dispute will defeat a motion for summary judgment but rather, there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphases in original)). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Id.* at 248. There is a

---

[2] On May 31, 2018, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 of the United States District Court for the District of Maryland and upon consent of all parties, this case was transferred to United States Magistrate Judge A. David Copperthite for all proceedings. ECF No. 8.

5

genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

The party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 249). Thus, "to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Moss v. Parks Corp.*, 985 F.2d 736, 738 (4th Cir. 1993) (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).

## B. Defendant's Motion for Summary Judgment

In its Motion, Defendant contends that there is no genuine dispute of material fact and makes several arguments as to why it is entitled to summary judgment on the breach of contract claim. ECF No. 25-1 at 12–18. First, Defendant asserts that the Agreement's unambiguous terms did not require it to place Plaintiff on a performance improvement plan prior to terminating the Agreement. *Id.* at 13–15. Next, Defendant contends that, even if it was required to place Plaintiff on a performance improvement plan, it was entitled to terminate the Agreement immediately due to Plaintiff's gross neglect and flock abandonment. *Id.* at 15–16. Finally, Defendant disputes the allegation that it terminated the Agreement due to Plaintiff's cancer diagnosis and argues that the undisputed evidence demonstrates Defendant properly terminated the Agreement due to Plaintiff's deficient performance. *Id.* at 16–17.

1. There Is A Genuine Issue Of Material Fact As To The Interpretation And Applicability Of Provisions Regarding Performance Improvement Plans.

A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418–19 (4th Cir. 2004). The parties agree that Maryland law applies. ECF No. 25-1 at 12–13; ECF No. 26-1 at 20–22.

In Maryland, when interpreting a contract, courts "seek to ascertain and effectuate the intention of the contracting parties." *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.*, 167 Md.App. 327, 391 (2006) (citation omitted). In ascertaining the parties' intent, Maryland adheres to the objective theory of contract interpretation. *See Dumbarton Improvement Ass'n, Inc. v. Druid*

7

*Ridge Cemetery Co.*, 434 Md. 37, 51 (2013). The objective theory of contract interpretation requires that a court

> must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous[,] there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Myers v. Kayhoe*, 391 Md. 188, 198 (2006) (quoting *Dennis v. Fire & Police Emps.' Ret. Sys.*, 390 Md. 639, 656–57 (2006)) (internal quotation marks omitted).

The process for determining the intent of the contracting parties is well established in Maryland. First, a court must ascertain whether the agreement is ambiguous. Language in a contract "may be ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 389 (1985). However, this Court has acknowledged that a contract is not ambiguous merely because the parties disagree as to its meaning. *See Fultz v. Shaffer*, 111 Md.App. 278, 299 (1996). Contracts are interpreted as a whole, and all disputed terms are to be interpreted in context. *See Phoenix Servs.*, 167 Md.App. at 392–93. A court's next step depends on whether it finds that the contract is ambiguous or unambiguous.

If it finds that a contract is unambiguous, then it must only look to the language of the contract to determine the intent of the parties. *See id.* at 392. A court must presume that the terms expressed in the agreement are what the parties intended, regardless of what the parties may have meant, but did not state in the contract. *Id.* When contract language is clear and unambiguous, there is no room for construction and courts may not consider what the parties thought the

agreement meant. *See Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985); *see also Phoenix Servs.*, 167 Md.App. at 392. If, on the other hand, a court finds that the contract is ambiguous, it must follow the second alternative, which is considering parol and/or extrinsic evidence to determine the parties' intent when the contract was made. *Phoenix Servs.*, 167 Md.App. at 393. "If, after having examined this extrinsic evidence, there still remain genuine issues of material fact regarding the contract's interpretation, summary judgment should be denied, and resolution of these issues should be left to the trier of fact." *Cty. Comm'rs of Charles Cty. v. Panda-Brandywine, L.P.*, 663 F.Supp.2d 424, 428 (D.Md. 2009) (citing *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007)) (applying Maryland law).

At issue here are the parties' respective interpretations of provisions in the Agreement regarding performance improvement plans, namely sections III(G) and III(J). Section III(G) of the Agreement addresses the implementation of performance improvement plans and states:

> If a Grower's Flock performance as determined by either the Standard Cost (as defined in the Grower Payment Schedule) or the basic management practices of the Grower reaches an unacceptable level as determined by [Defendant], then the following may occur:
>
> 1. Consultation with [Defendant]'s Grow-Out Department management and placement of Grower on an action plan or performance improvement plan.
>
> 2. Action plans will be developed in writing with a Grower.
>
> 3. Action plans precede a notice of termination that will be issued concurrently with placing a Grower on a performance improvement plan so the Grower is advised that if the performance improvement plan is not met that the Grower will be terminated and the date of termination.
>
> 4. A copy of the current performance improvement plan standards [is] attached hereto as **Schedule I**. New contracts or new Flocks may have changed terms for performance improvement plans that will be provided to the Grower.

> 5. If the Grower fails to comply with the performance improvement plan to [Defendant]'s satisfaction[,] the contract will be terminated at the date specified in the initial notice.

ECF No. 25-6 at 5 (emphasis in original). Schedule I sets forth Defendant's criteria for placing a Grower on a performance improvement plan and states that a performance improvement plan is required "[w]hen a grower's six Flock average reaches (-) minus $.0065 or worse." *Id.* at 8.

Section III(J) of the Agreement addresses termination and states in relevant part:

> Grower may cancel this Agreement without cause and either party may cancel this Agreement with cause, but in all cases, upon first giving the other party written notice of such decision to terminate: provided, however, that such written notice on the part of the Grower or [Defendant] shall be given no less than ninety (90) days prior to the termination date. . . .
>
> . . . .
>
> . . . Except for cause or economic necessity, such as Grower's gross negligence, Flock abandonment or material financial breach, hereinafter defined, [Defendant] will not terminate this Agreement without first providing Grower an opportunity to cure any deficiencies through a performance improvement plan or other written agreement reached by the parties.

*Id.* at 5–6.

Defendant asserts that, pursuant to the Agreement, it was not required to place Plaintiff on a performance improvement plan because it could not calculate Plaintiff's six flock average as Plaintiff had only hosted three flocks at the time of termination. ECF No. 25-1 at 14. To support the contention that it does not calculate a six flock average until three flocks have been settled and therefore was not required to place Plaintiff on a performance improvement plan, Defendant relies on a document attached to the Agreement titled "Grower Payment Schedule," which defines a six flock average as "the simple average of the Grower's most recent six flocks' Standard Cost" and

10

further states "[a] Grower with three flocks or less will be assigned the average six flock (i.e., zero)." ECF No. 25-6 at 12.

However, as Plaintiff correctly notes, the provisions in the Agreement stated above and the criteria set forth in Schedule I are inconsistent with Defendant's interpretation. *See id.* at 5–6, 8. Sections III(G) and III(J) clearly demonstrate Defendant's intent to place growers on performance improvement plans prior to termination. Indeed, Section III(J) unambiguously states that Defendant "will not terminate this Agreement without first providing Grower an opportunity to cure any deficiencies through a performance improvement plan or other written agreement reached by the parties." *Id.* at 6. Neither provision includes any language that disqualifies a grower from a performance improvement plan until they have hosted a minimum number of flocks and have a six flock average calculated. *See id.* at 5–6. Likewise, Schedule I sets forth the criteria for when a performance improvement plan is required but does not state that growers are ineligible for a plan until they have a six flock average calculated. *Id.* at 8.

After considering the available evidence, the Court finds that there is ambiguity and a genuine dispute of material fact as to the interpretation and applicability of the performance improvement plan provisions to Plaintiff. In light of this ambiguity, "summary judgment should be denied, and resolution of th[is] issue[ ] should be left to the trier of fact." *Cty. Comm'rs of Charles Cty.*, 663 F.Supp.2d at 428; *see also Abhe & Svoboda, Inc. v. Bell BCI Co.*, 520 F.Supp.2d 701, 704–05 (D.Md. 2007) (denying defendant's motion for summary judgment where the parties' "conflicting interpretations" rendered the contract ambiguous). Accordingly, Defendant's Motion will be denied.

### 2. There Is A Genuine Issue Of Material Fact As To Whether Cause Existed For Defendant To Terminate The Agreement.

Next, Defendant contends that, even if the Agreement required it to place Plaintiff on a performance improvement plan prior to termination, Defendant was entitled to terminate the Agreement immediately for cause due to Plaintiff's gross neglect and flock abandonment. ECF No. 25-1 at 15–16. Plaintiff, however, has proffered evidence contradicting Defendant's theory. ECF No. 26-1 at 18–19. As a result, there is a significant dispute of material fact affecting the outcome of the case which prevents the Court from entering summary judgment for Defendant. *See Anderson*, 477 U.S. at 248.

Considering Defendant's Motion, the Court concludes that, when viewing the evidence in the light most favorable to Plaintiff, a genuine dispute of material fact exists. Defendant asserts that it was entitled to terminate the Agreement immediately pursuant to the following provisions of Section III(J):

> Grower may cancel this Agreement without cause and either party may cancel this Agreement with cause . . . .
>
> . . . .
>
> . . . Except for cause or economic necessity, such as Grower's gross negligence, Flock abandonment or material financial breach, hereinafter defined, [Defendant] will not terminate this Agreement without first providing Grower an opportunity to cure any deficiencies through a performance improvement plan or other written agreement reached by the parties.
>
> Notwithstanding any provision in this Agreement to the contrary, in the event of Grower's gross negligence or Flock abandonment, [Defendant] shall have the right to remove the Flock and/or take over said work and complete it in any manner it sees fit, with any and all expenses incurred by [Defendant] being charged back to the Grower, and at [Defendant]'s option this Agreement, at that time, may be terminated without notice.

ECF No. 25-6 at 5–6. According to Defendant, over the course of the three flocks, Plaintiff grossly neglected the broilers and conditions on the farm by, *inter alia*, "repeatedly fail[ing] to address serious and potentially catastrophic conditions on the farm, such as active alarms, heat loss, fan malfunction, [and] proper equipment function," failing to provide the broilers with adequate access to food and water, and "fail[ing] to properly dispose of dead birds," all of which culminated in animal welfare and biosecurity concerns. ECF No. 25-1 at 15. Additionally, Defendant contends that Plaintiff abandoned the third flock for at least one week and failed to notify Defendant or ensure that proper care would be provided in his absence. *Id.* at 15–16. In support of its argument, Defendant cites the affidavit of Mr. Smith, who testified to the "drastic" decline in Plaintiff's performance in caring for the broilers and the farm over the course of the three flocks. *Id.* (citing ECF No. 25-2).

"[I]n the face of conflicting evidence, . . . summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes." *Ward v. Branch Banking & Tr. Co.*, No. ELH-13-1968, 2016 WL 2930907, at *6 (D.Md. May 17, 2016). Here, Plaintiff points to contradictions between Mr. Smith's testimony and the Chick Placement Reports and Farm Visitation Reports completed by Mr. Akers to contest Defendant's version of the facts. While the reports do reflect some issues with Plaintiff's care over the course of the three flocks, they also reflect that Plaintiff consistently received "ok" ratings in most categories and that he resolved most issues promptly before the next inspection and report. ECF Nos. 26-7, 26-9, 26-11. Additionally, several of the reports include positive feedback from Mr. Akers, such as "[c]hicks look great," "[e]quipment heights look good," "[e]xcellent work," "[c]onditions look great," and "I have every inclination to believe you will eventually be a top Grower." ECF No. 26-7 at 1–4, 7; ECF No. 26-9 at 4–9; ECF No. 26-11 at 1–4, 9. Plaintiff also proffers deposition testimony

from his farm employees, Stephen MacEmcy and Denise Jones, who testified that they managed the farm and cared for the broilers during Plaintiff's week-long absence. ECF No. 26-14 at 6–8; ECF No. 26-15 at 2, 4–6. Such evidence disputes Defendant's theory that Plaintiff grossly neglected and abandoned the broilers and the farm and, thus, calls into question whether there was cause for Defendant to terminate the Agreement. Entry of summary judgment for Defendant is, therefore, inappropriate at this stage because a reasonable jury could return a verdict for Plaintiff. *Anderson*, 477 U.S. at 247–48; *Dulaney*, 673 F.3d at 330. Accordingly, Defendant's Motion will be denied.

> 3. There Is A Genuine Issue Of Material Fact As To Defendant's Reason For Terminating The Agreement.

Lastly, Defendant contends that it is entitled to summary judgment because the undisputed facts show that it terminated the Agreement based on Plaintiff's "wholly deficient care of the flocks," rather than his cancer diagnosis. ECF No. 25-1 at 16–17. According to Defendant, Mr. Smith made the decision to terminate the Agreement and, at the time of the decision, Mr. Smith had no knowledge of Plaintiff's diagnosis. *Id.* at 17. Plaintiff, however, has proffered evidence contradicting Defendant's narrative. ECF No. 26-1 at 23–24. As a result, there is a significant dispute of material fact regarding Defendant's reason for termination and the Court cannot resolve this question at the summary judgment stage.

Considering Defendant's Motion, the Court concludes that, when viewing the evidence in the light most favorable to Plaintiff, a genuine dispute of material fact exists. Defendant once again relies upon the affidavit of Mr. Smith, who testified that he "made the decision that [Defendant] would not place any additional flocks with Plaintiff" and that his decision "was due to Plaintiff's progressive and serious failures in caring for the flocks[,] . . . which led to serious animal welfare and biosecurity concerns." ECF No. 25-2 at 6, ¶ 22. According to Mr. Smith, he

"had absolutely no knowledge that Plaintiff was experiencing any health issues, no knowledge that Plaintiff was suffering from any medical conditions, and no knowledge that Plaintiff had been diagnosed with cancer" and he only learned of Plaintiff's condition subsequently after making the decision to terminate. *Id.* ¶¶ 22, 24. Although Mr. Smith stated that he did not inform Plaintiff of the termination until after the third flock was removed from the farm, it is unclear from his affidavit or his deposition when Mr. Smith actually made the decision to terminate. *See id.* ¶¶ 22–25; ECF No. 25-5 at 4–5.

"Where the determination of what actually happened depends on an assessment of the credibility of the [party's] respective witnesses, 'this assessment is a disputed issue of fact that cannot be resolved on summary judgment.'" *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 751 (4th Cir. 2016) (quoting *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992)). Moreover, as discussed, "in the face of conflicting evidence, . . . summary judgment is ordinarily not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Ward*, 2016 WL 2930907, at *6. Here, Plaintiff disputes Mr. Smith's testimony by proffering email communications from Mr. Smith demonstrating that he had knowledge of Plaintiff's condition. ECF No. 26-16. Plaintiff allegedly informed Mr. Akers of his diagnosis on or about February 17, 2017. ECF No. 1 at 8, ¶ 25. In an email dated February 19, 2017, Mr. Smith reported on the conditions at Plaintiff's farm and noted that he "[c]ouldn't reach [Plaintiff] on [the] phone, apparently he is in [the] hospital with cancer." ECF No. 26-16 at 1. In a second email dated February 24, 2017, Mr. Smith indicated a decision to terminate, stating that he would be "meeting with [Plaintiff] to inform him that this is [the] last flock" and that Defendant would be "terminating [the] contract." *Id.* at 3. Mr. Smith then communicated his decision to Plaintiff via telephone on or about March 9, 2017. ECF No. 1

15

at 8, ¶ 26. Additionally, Plaintiff points out that Mr. Smith's stated reason for terminating the Agreement—Plaintiff's deficient care—is inconsistent with the Chick Placement Reports and Farm Visitation Reports completed by Mr. Akers demonstrating that the care provided was consistently "ok" in most categories. ECF Nos. 26-7, 26-9, 26-11.

Defendant's ability to show that it did not breach the Agreement but rather properly terminated it for cause turns on the credibility of Mr. Smith, whose veracity Plaintiff has questioned. The case cannot be resolved without weighing Mr. Smith's testimony and determining whether Defendant properly terminated the Agreement for the reason stated. Thus, the Court concludes that if a jury were to credit Plaintiff's evidence and discredit Mr. Smith's testimony, a jury could reasonably return a verdict in Plaintiff's favor. Accordingly, Defendant's Motion will be denied.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that there are genuine issues of material fact as to the interpretation and applicability of the performance improvement plan provisions to Plaintiff, whether there was cause for Defendant to terminate the Agreement for gross neglect and flock abandonment, and Defendant's stated reason for terminating the Agreement. Therefore, Defendant's Motion (ECF No. 25) is DENIED. A separate order will follow.

Date: 17 June 2019

A. David Copperthite
United States Magistrate Judge